**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMUEL CHASE, derivatively on behalf of FACEBOOK, INC., | |
| Plaintiff, | |
| v. | Case No.: _____ |
| MARK ZUCKERBERG, SHERYL K. SANDBERG, CHRISTOPHER K. COX, PETER A. THIEL, MARC L. ANDREESSEN, REED HASTINGS, ERSKINE B. BOWLES, JAN KOUM, and SUSAN DESMOND-HELLMANN | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| FACEBOOK, INC. | |
| Nominal Defendant | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Samuel Chase ("Plaintiff"), by his undersigned attorneys, derivatively for the benefit of nominal defendant Facebook, Inc. ("Facebook" or the "Company"), alleges for this Verified Stockholder Derivative Complaint against defendants, upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on the investigation conducted by his attorneys, as follows. This investigation included, among other things, a review of the Company's announcements and press releases; filings made by the Company with the United States Securities and Exchange Commission ("SEC"); public filings in federal courts, including the pending federal securities fraud and consumer class action litigation against the Company; corporate governance documents available on the Company's website; governmental and regulatory

investigations of the Company and documents relating thereto; and news reports and other publicly

available information about the Company.

## PRELIMINARY STATEMENT

[I]t's clear now that we didn't do enough to prevent these tools from being used for harm as well. That goes for fake news, foreign interference in elections, and hate speech, as well as developers and data privacy. We didn't take a broad enough view of our responsibility, and that was a big mistake. It was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here.

- Mark Zuckerberg, prepared remarks for April 11, 2018 hearing before the United States House of Representatives Committee on Energy and Commerce

1.     Facebook has grown over the course of fourteen years from an internet database replicating Harvard University's "freshman face book" to an international online social media and social networking service with over 1.4 billion global daily users and over 2.13 billion monthly users. One-fifth of all internet traffic in the United States occurs on Facebook.

2.     As Facebook has grown, it has faced a litany of incidents involving the protection of its users' private data. The most catastrophic of these incidents came to light on March 17, 2018, when *The New York Times* and *The Guardian* published articles detailing how a company called Cambridge Analytica and its lead researcher, Aleksandr Kogan ("Kogan"), had harvested personal data from up to 87 million Facebook users to create detailed data profiles for over 30 million of them. These data profiles were then used to push tailored content to users and likely affected the United Kingdom's 2016 Brexit vote and the 2016 U.S. presidential election. Cambridge Analytica has substantial ties to Facebook director and early investor Peter Thiel ("Thiel"). These connections likely played a part in the Individual Defendants' (as defined herein) failure to stop Cambridge Analytica or contain its misappropriation of Facebook user data.

3.     Following the Cambridge Analytica incident, Facebook's founder, Chairman, and Chief Executive Officer ("CEO"), Mark Zuckerberg ("Zuckerberg"), and Chief Operating Officer ("COO") and director, Sheryl K. Sandberg ("Sandberg"), waited several days to respond publicly.[1]

4.     Zuckerberg and Sandberg both, fittingly, issued lengthy Facebook posts addressing the Breach of Trust.  In his post, Zuckerberg admitted that he and the other Individual Defendants first learned of Cambridge Analytica's improper use of user data from a 2015 article in *The Guardian*, that Facebook had banned the app in question, and that Facebook had demanded that Cambridge Analytica and Kogan formally certify that they had deleted all improperly acquired certifications.  He summed up the event as follows:

> This was a breach of trust between Kogan, Cambridge Analytica and Facebook.  But it was also a breach of trust between Facebook and the people who share their data with us and expect us to protect it.  We need to fix that.

5.     According to Kate Losse, an early Facebook employee and former speechwriter for Zuckerberg, the Breach of Trust is different from previous Facebook privacy scandals because it concerns an issue at the core of Facebook's business model that cannot be easily rectified:  the disclosure of Facebook user data to outside sources through its third-party developer platform.

6.     The Individual Defendants have known about the Breach of Trust from at least December 11, 2015 to the present (the "Relevant Period") and yet failed to act to rectify it in any substantial way.  As Facebook failed to act on this known and ongoing threat, the Individual Defendants caused the Company to file several materially misleading statements with the SEC, including the Company's 2016 and 2017 Proxy Statements.

---

[1] When Zuckerberg and Sandberg finally publicly commented, they made sure not to call the incident a data breach, instead using the focus-grouped term "Breach of Trust."  This Complaint will also refer to the Cambridge Analytica incident as the "Breach of Trust."

7.     Moreover, in the days leading up to the Breach of Trust coming to light, defendants Zuckerberg, Sandberg, and Jan Koum ("Koum") illegally sold Facebook shares at artificially-inflated prices, resulting in over $1.45 billion in proceeds.

8.     Due to the Breach of Trust, Facebook has lost nearly $100 billion in market capitalization, been the subject of substantial negative press, been sued for violations of the federal securities laws and failure to protect consumer privacy, and been investigated by numerous state and federal agencies.  The Breach of Trust has caused great harm to the Company and will continue to do so for the foreseeable future.

9.     This is a stockholder derivative action brought in the right, and for the benefit, of Facebook against certain of its officers and directors seeking to remedy the Individual Defendants' breaches of fiduciary duties, violations of the federal securities laws, unjust enrichment, and breaches of fiduciary duties for insider selling and misappropriation of information, which have caused substantial harm to Facebook and the Company's stockholders.  Zuckerberg controls almost 60% of Facebook's voting power.  Thus, he controls the entire board of directors (the "Board") and they will not prosecute the claims described herein.  As such, demand is excused.

## JURISDICTION AND VENUE

10.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

11.     This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. All defendants are completely diverse from Plaintiff, and the amount in controversy exceeds $75,000.00.

12.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over nominal defendant Facebook because it is authorized to do business in this state, has consented to service in this state, and its principal place of business is within this District.  This action is not a collusive one to confer jurisdiction that the court would otherwise lack.

13.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

14.     Plaintiff has been a stockholder of Facebook common stock at all relevant times and has continuously held Facebook common stock at all relevant times.  Plaintiff is a citizen of Pennsylvania.

15.     Nominal Defendant Facebook is a Delaware corporation with its principal executive offices located at 1601 Willow Road, Menlo Park, California 94025.  Facebook is a citizen of Delaware and California.  Facebook was founded in 2004 and provides various products for users to connect and share through mobile devices, personal computers, and other surfaces worldwide.  Its products include the Facebook website and mobile application that enables users to connect, share, discover, and communicate with each other on mobile devices and personal computers; Instagram, a community for sharing visual stories through photos, videos, and direct messages; Messenger, a

messaging application to communicate with other people, groups, and businesses across various platforms and devices; and WhatsApp, a mobile messaging application.  The Company also offers Oculus virtual reality technology and content platform, which allows people to enter an immersive and an interactive environment to train, learn, play games, consume content, and connect with others. As of December 31, 2017, Facebook's website had approximately 1.4 billion daily active users.

16.     Defendant Zuckerberg founded Facebook in his dorm room in 2004, and has been the Company's chairman and CEO since that time.  He is responsible for Facebook's day-to-day operations and the overall direction and product strategy of the Company.  In statements following the Breach of Trust, Zuckerberg has taken personal responsibility, telling CNN, "I started Facebook, and at the end of the day I'm responsible for what happens on our platform."  Zuckerberg controls 59.7% of Facebook's voting power.  In the days leading up to the Breach of Trust coming to light, Zuckerberg sold 5,423,200 shares of Facebook stock for proceeds of over $978 million while in possession of material non-public information.  He is a named defendant in the Securities Class Actions (as defined herein).  Zuckerberg is a citizen of California.

17.     Defendant Sandberg has been Facebook's COO since March 2008, and a director since June 2012.  In the days leading up to the Breach of Trust coming to light, Sandberg sold 196,684 shares of Facebook stock for proceeds of over $35 million while in possession of material non-public information.  Sandberg is a citizen of California.

18.     Defendant Christopher K. Cox ("Cox") has been the Chief Product Officer at Facebook since 2014.  He also serves as Zuckerberg's chief of staff and leads the Company's worldwide product management, design, and marketing functions.  Cox is responsible for the core products and features that shape the social experience for Facebook's users.  He joined Facebook in 2005 as a software engineer and helped build the first versions of Facebook's News Feed (as defined herein).  He is a citizen of California.

19.     Defendant Thiel has been a Facebook director since April 2005.  He is a venture capitalist who has served as a Partner of Founders Fund, a venture capital firm, since 2005.  Thiel was a supporter of Donald J. Trump's 2016 presidential election campaign (the "Trump Campaign") and openly campaigned for Mr. Trump.  Thiel also has substantial ties to Steve Bannon ("Bannon") and Robert Mercer ("Mercer"), two key founders and funders of Cambridge Analytica.  Employees from Thiel's company Palantir Technologies ("Palantir") also worked on the data mining operation with Cambridge Analytica.  Thiel is a citizen of California.

20.     Defendant Marc L. Andreessen ("Andreessen") has been a Facebook director since June 2008.  He is the co-founder and general partner of Andreessen Horowitz, a venture capital firm. Andreessen is a member of the Audit Committee and a citizen of California.

21.     Defendant Reed Hastings ("Hastings") has been a Facebook director since June 2011. He is the founder, CEO, and Chairman of Netflix.  Facebook and Netflix have a partnership through their "Friends and Community" initiative launched in March 2013, which allows Netflix users to share data about their viewing habits on Facebook.  Hastings is a citizen of California.

22.     Defendant Erskine B. Bowles ("Bowles") has been a Facebook director since September 2011.  He is the Chair of the Audit Committee and a citizen of North Carolina.

23.     Defendant Koum has been a Facebook director since October 2014.  He co-founded WhatsApp and joined Facebook's Board when it acquired WhatsApp.  His WhatsApp co-founder, Brian Acton, who is not employed by Facebook, tweeted that it was time to "#deletefacebook" in response to the Breach of Trust.  In the days leading up to the Breach of Trust coming to light, Koum sold 2,485,347 shares of Facebook stock for proceeds of over $442 million while in possession of material non-public information.  Koum is a citizen of California.

24.     Defendant Susan Desmond-Hellmann ("Hellmann") has been a Facebook director since February 2013.  She is a member of the Audit Committee and a citizen of Washington.

25.     Defendants Zuckerberg, Sandberg, Thiel, Andreessen, Hastings, Bowles, Koum, and Hellmann are referred to herein as the "Director Defendants."

26.     Defendants Zuckerberg, Sandberg, Cox, Thiel, Andreessen, Hastings, Bowles, Koum, and Hellmann are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     Due to their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Facebook were required to, among other things:

a.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

e.      comply with the terms of any agreements with government agencies; and

f.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

30.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.    In addition, the Board has adopted a set of corporate governance guidelines to promote the functioning of the Board and its committees and to set forth a common set of expectations as to how the Board should perform its functions (the "Corporate Governance Guidelines").

32.    The Corporate Governance Guidelines include the following language:

Facebook's Board of Directors has adopted these Corporate Governance Guidelines to reflect the Board's strong commitment to sound corporate governance practices and to encourage effective policy and decision making at both the Board and management level, with a view to enhancing long-term value for Facebook stockholders. These guidelines are intended to assist the Board in the exercise of its governance responsibilities and serve as a flexible framework within which the Board may conduct its business, not as a set of binding legal obligations.

*       *       *

I.  Responsibilities of the Board of Directors

The Board acts as the management team's adviser and monitors management's performance. The Board also reviews and, if appropriate, approves significant transactions and develops standards to be utilized by management in determining the types of transactions that should be submitted to the Board for review and approval or notification.

The Board is responsible for selecting and appointing the Chief Executive Officer and Chairman of the Board, as well as the Lead Independent Director of the Board, if any. The Chief Executive Officer shall select and appoint all other officers of Facebook, subject to the Board's approval of such appointments if required under the company's Bylaws.

Each member of the Board (each, a "director" and collectively, the "directors") is expected to spend the time and effort necessary to properly discharge such director's responsibilities. Accordingly, a director is expected to regularly attend meetings of the Board and Board committees on which such director sits, and review prior to each meeting the material distributed in advance for such meeting. A director who is unable to attend a meeting (which it is understood will occur on occasion) is expected to notify the Chairman or the chairperson of the appropriate committee in advance of such meeting.

33.     The Company has also adopted a Code of Conduct for all employees (the "Code").  The Code states:

### 8. PROTECTION OF USER DATA

In your role at Facebook, you may have access to information systems or tools that enable you to view certain information on Facebook sites relating to users (including your coworkers, as well as registered and non-registered individuals), which is not available to the public.  These tools are important and necessary to enable you to perform your work effectively.  However, it is of the utmost importance that all Facebook Personnel treat this data access with extreme sensitivity and caution.  Facebook's brand and the trust users put in us depend on your good judgment and discretion when using tools that allow you to view user information that would otherwise not be visible to you on the sites.  Please read the User Data Access Policy, available on the wiki here, which governs your use of and access to user data as an employee of Facebook.

*          *          *

### 10. COMPLIANCE WITH LAWS

Facebook Personnel are expected to act within the bounds of applicable laws, rules and regulations of the countries where we do business.  The application of these and other laws can be complex and fact-dependent.  If you have any questions about the applicability of interpretation of any law, rule or regulation, you should contact the Legal Department.

*          *          *

- Insider Trading

Under the federal securities laws, it is generally illegal to trade in Facebook securities while in the possession of material non-public information about the company.  It is also generally illegal to provide material non-public information about Facebook to others who then trade on the basis of that information.  Please refer to our Insider Trading Policy here and direct all inquiries regarding the policy to trading@fb.com.

*          *          *

### 11. REPORTING VIOLATIONS

If you learn about or suspect a violation of this code, another Facebook policy, or any law, you shall promptly report it to your manager, another manager, Human Resources, Internal Audit, or the Legal Department.  If you are uncomfortable making such a report, you may do so anonymously if permitted by applicable law.  For more information on reporting violations, please see Facebook's Whistleblower and Complaint Policy on the wiki here.

In cases in which an individual reports a suspected violation of policy or law in good faith and is not engaged in the questionable conduct, Facebook will attempt to keep its discussions and actions confidential to the greatest extent possible and in compliance with applicable laws and regulations governing privacy. Facebook will not retaliate against anyone making a good-faith report of a potential violation. Facebook will investigate any report of a violation. You must cooperate fully with any investigation, but should not investigate independently, as alleged violations may involve complex legal issues, and you may risk compromising the integrity of a formal investigation.

Conduct that violates the law or company policies is grounds for prompt disciplinary or remedial action. In addition, your failure to report a known violation of law or company policy by someone else may result in disciplinary action for employees and/or termination of employment/your relationship with Facebook. Discipline for a violation of Facebook policies or applicable law may range from a warning up to and including summary termination of employment/your relationship with Facebook (in accordance with applicable law). Where laws have been violated, we will cooperate fully with the appropriate authorities.

34.     In addition, the Company's Audit Committee, comprised of defendants Bowles (Chair), Andreessen, and Hellmann, was specifically tasked with the Board's oversight responsibilities. The conduct of the Audit Committee is governed by the Charter of the Audit Committee of the Board of Directors of Facebook, Inc. (the "Audit Charter").

35.     Pursuant to the Audit Charter:

I. PURPOSE

The purpose of the Audit Committee (the "*Committee*") of the Board of Directors (the "*Board*") of Facebook, Inc. (the "*Company*") shall be to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and the independence, qualifications and performance of the independent auditor. The Committee has an oversight role and in fulfilling that role it relies on the reviews and reports noted below. This charter (the "*Charter*") sets forth the authority and responsibilities of the Committee in fulfilling the purposes described herein. In fulfilling its responsibilities, it is recognized that members of the Committee are not full-time employees of the Company and are not, and do not represent themselves to be, professional accountants or auditors. The functions of the Committee are not intended to duplicate or substitute for the activities of management and the independent auditor, and the Committee members cannot provide any expert or special assurance as to the Company's financial statements, internal controls or management of risk or any professional certifications as to the work of the independent auditor.

While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the

Company's financial statements are complete, accurate and in accordance with generally accepted accounting principles in the United States. Each member of the Committee shall be entitled to rely on (a) the integrity of those persons and organizations within and outside of the Company from which it receives information, (b) the accuracy of the financial and other information provided to the Committee by such persons or organizations absent actual knowledge to the contrary (which shall be promptly reported to the Board), and (c) representations made by management as to any audit and non-audit services provided by the independent auditor.

*     *     *

III:  RESPONSIBILITIES AND DUTIES

The principal responsibilities and duties of the Committee in serving the purposes outlined in Section I of this Charter are set forth below. These duties are set forth as a guide with the understanding that the Committee will carry them out in a manner that is appropriate given the Company's needs and circumstance. The Committee may supplement them as appropriate and may establish policies and procedures from time to time that it deems necessary or advisable in fulfilling its responsibilities.

*     *     *

B.  **Financial Statements and Disclosures**

1.  Financial Statements and Disclosures

   a.  The Committee will meet to review and discuss with the independent auditor and the Company's management the Company's quarterly financial statements and annual audited financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

   b.  The Committee will be responsible for recommending to the Board whether the annual audited financial statements should be included in the Company's annual report on Form 10 K.

   c.  The Committee will cause to be prepared and review a report to the Company's stockholders for inclusion in the Company's proxy statement as required by the Commission Rules.

   d.  The Committee will discuss with the independent auditors and the Company's management any items appropriate or required to be discussed in accordance with applicable PCAOB standards in connection with the preparation of financial statements of the Company.

2.  *Earnings Announcements and Other Financial Information*. The Committee will discuss generally with the Company's management and the independent auditor, as appropriate, the type of information to be disclosed and type of presentation to

be made regarding the Company's earnings press releases and other financial information released to analysts and rating agencies.

3. *On-going Reviews.* In connection with the foregoing, the Committee will review the Company's financial reporting and accounting standards and principles, significant changes in such standards or principles or in their application and the key accounting decisions affecting the Company's financial statements.

*     *     *

D. **Controls and Procedures**

1. *Review of Processes, Systems, Controls and Procedures.* The Committee will review and discuss with the independent auditor and the Company's management their periodic reviews of the Company's accounting and financial reporting processes, systems of internal control (including any significant deficiencies and material weaknesses identified in their design or operation), and disclosure controls and procedures (and management's reports thereon).

2. *Legal and Compliance Matters.* Review with management, at least annually, (i) the Company's program for promoting and monitoring compliance with applicable legal and regulatory requirements, and (ii) the Company's major legal compliance risk exposures and the steps management has taken to monitor or mitigate such exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

3. *Other Risk Assessment and Risk Management.* The Committee will discuss with the Company's management the Company's major financial risk and enterprise exposures and the steps management has taken to monitor and control such exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.

4. *Whistleblower Procedures.* The Committee is responsible for establishing and overseeing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

36.     In violation of the Audit Charter, and their general duties as members of the Audit Committee, defendants Bowles, Andreessen, and Hellmann conducted little, if any, oversight of the Company's internal controls over public reporting of the potential liabilities related to the Company's misappropriation or complicity of third parties' misappropriation of user data, resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit

Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's stockholders.

FACTUAL BACKGROUND

**A.     The History of Facebook**

37.     Facebook was created in a dorm room in the fall of 2003 as a way for college boys to check out co-eds.  It was officially launched on February 4, 2004.  At that time, no one envisioned it being a crucial part of the global information infrastructure.

38.     Facebook started out only allowing users from verified college email accounts and only allowing users to post one "profile" picture and provide minimal information about themselves. Over time, the service has evolved into a communications platform for over two billion global users with a user information database rivaled only by the credit bureaus.

39.     In October 2005, Facebook expanded to allow users to post additional photos in albums.  It quickly expanded to allow videos to also be posted and integrated a news feed where users could post personal messages or link and embed outside content and memes (the "News Feed").

40.     On September 5, 2006, Facebook outraged a large swath of its users by unveiling the News Feed.  This acted as a home page with news that the user had not asked for about all of his or her friends organized and ranked by Facebook's secret algorithm.  The News Feed fundamentally changed Facebook from a profile-based site to a content sharing-based site.  Facebook took no corrective action in response to this outrage and eventually users accepted and embraced the News Feed.  This reaction emboldened the Individual Defendants future responses to user concerns regarding privacy.

41.     Shortly thereafter, Facebook access was expanded from just college students to anyone over 13 years old with a valid email address.

42.     In May 2007, Facebook launched Facebook Platform for developers to build applications which would work within Facebook and rely on user data.  One of the first such applications – soon to be called "apps" – shared what users had purchased online with their friends. The aim was to provide trusted feedback on products to users, but it struck many users as a breach of their right to privacy.  In these early days, Zuckerberg focused on the term "social graph," meaning "a series of nodes and connections, with the nodes individuals and the connections the friendships," as the essential asset at Facebook.  In launching Facebook Platform, he sought to make that asset available to other companies.

43.     Zuckerberg fathered this free flow of information with a utopian version of the Internet in mind.  As long as everyone with access to the vast amounts of user data had only good intentions, there was little reason for the Company to concern itself with data protection procedures.

**B.      2011 FTC Investigation and Consent Order**

44.     In 2011, the Federal Trade Commission ("FTC") commenced an investigation into Facebook's handling of private user data (the "FTC Investigation").  The FTC Investigation concluded on November 29, 2011, with the filing of a complaint detailing Facebook's violations and a consent order containing the terms of Facebook's settlement with the government agency (the "Consent Order").  The FTC's complaint listed a number of instances in which Facebook allegedly made promises that it failed to keep.  The FTC detailed these failed promises in a press release as follows:

- In December 2009, Facebook changed its website so certain information that users may have designated as private – such as their Friends List – was made public. They did not warn users that this change was coming or get their approval in advance.

- Facebook represented that third-party apps that users installed would have access only to user information that they needed to operate.  In fact, the apps could access nearly all of users' personal data – data the apps did not need to operate.

- Facebook told users they could restrict sharing of data to limited audiences – for example with "Friends Only."  In fact, selecting "Friends Only" did not prevent their information from being shared with third-party applications their friends used.

- Facebook had a "Verified Apps" program and claimed it certified the security of participating apps.  It did not.

- Facebook promised users that it would not share their personal information with advertisers.  It did.

- Facebook claimed that when users deactivated or deleted their accounts, their photos and videos would be inaccessible.  But Facebook allowed access to the content after users had deactivated or deleted their accounts.

- Facebook claimed that it complied with the U.S.-EU Safe Harbor Framework that governs data transfer between the U.S. and the European Union.  It did not.

45.     The terms of the Consent Order prohibited Facebook from making any further deceptive privacy claims, required Facebook to get consumers' approval before it changed the way it shared their data, and required that Facebook obtain periodic assessments of its privacy practices by independent, third-party auditors for the next 20 years – until 2031.  According to the press release, under the Consent Order, Facebook was specifically:

- barred from making misrepresentations about the privacy or security of consumers' personal information;

- required to obtain consumers' affirmative express consent before enacting changes that override their privacy preferences;

- required to prevent anyone from accessing a user's material more than 30 days after the user has deleted his or her account;

- required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality of consumers' information; and

- required, within 180 days, and every two years after that for the next 20 years, to obtain independent, third-party audits certifying that it has a privacy program in place that meets or exceeds the requirements of the FTC order, and to ensure that the privacy of consumers' information is protected.

46.     The information that has recently come to light regarding the Breach of Trust shows that the Individual Defendants took little action to protect users' data and instead steered the Company to violate the terms of the Consent Order.

## SUBSTANTIVE ALLEGATIONS

**C.      The Individual Defendants' History of Hiding Facebook's Privacy Missteps**

47.     Facebook has a long history of trying to sweep user privacy issues under the rug until they are forced into the open by a government investigation or whistleblower.  The Breach of Trust has opened the flood gates for other issues to also come to light.

48.     Even when Zuckerberg was creating Facebook with his friends in his Harvard University dorm room, he looked down upon users for trusting him with their data.  An instant messenger exchange he had during that time, as reported by *Business Insider*, went as follows:

Zuck[erberg]:  Yeah so if you ever need info about anyone at Harvard

Zuck[erberg]:  Just ask.

Zuck[erberg]:  I have over 4,000 emails, pictures, addresses, SNS [sic]

[Redacted Friend's Name]:  What? How'd you manage that one?

Zuck[erberg]:  People just submitted it.

Zuck[erberg]:  I don't know why.

Zuck[erberg]:  They "trust me"

Zuck[erberg]:  Dumb fucks.

49.     Ever since Facebook began to allow outside developers to build their own applications to run on Facebook Platform, the Individual Defendants have caused Facebook to allow developers to access the account information of Facebook users that use their apps, and the account information of those users' friends.  Facebook's Extended Profile Settings allowed developers to easily gain access to every part of a user's profile, photos, likes, friends, subscriptions, work history, and more.  Developers were freely allowed access to even this non-essential information in exchange for users

signing up to use their apps.  This is exactly how Kogan and Cambridge Analytica were able to mine the complete profile data of the 270,000 users who signed up for their "thisisyourdigitallife" personality quiz app and up to 87 million of their friends.

50.     This type of massively unwarranted data pulling is not new.  In the 2012 election, many watchdogs raised concerns over Barack Obama's campaign's use of Facebook user data to target voters and potential supporters.  Cambridge Analytica took these tactics to the next level by coordinating in-depth voter profiles with factually inaccurate messages that would exploit psychological vulnerabilities.

51.     In recent years, Facebook has had multiple issues involving user privacy.  In June 2013, a bug in its software exposed private contact information of 6 million users to anyone who had some connection to the person and knew at least one piece of their contact information.  For example, someone who had your email address and was your Facebook friend would be granted access to your cell phone number.  Facebook explained that this bug occurred when trying to implement a system to help recommend new friends to users.

52.     Another incident occurred in July 2014, when a Facebook data scientist conducted a mood-manipulation experiment on over 500,000 unsuspecting Facebook users selected at random. The experiment purposely altered the users' News Feeds to show more positive or negative posts. The study aimed to show how emotions could spread over social media and perhaps laid the ground work for Cambridge Analytica's intrusion.  When the results of the study were published in the *Proceedings of the National Academy of Sciences*, ethical questions sparked a backlash.  Adam D. I. Kramer, the data scientist who led the experiment, apologized by saying, "I can understand why some people have concerns about it, and my co-authors and I are very sorry for the way the paper described the research and any anxiety it caused."

53.     In 2015, a class action lawsuit was filed in the United States District Court for the Northern District of California on behalf of Facebook users who alleged that the Company had unlawfully scanned their faces, uploaded photographs, and learned their faces without their consent in violation of Illinois' Biometric Information Privacy Act. *See In re Facebook Biometric Information Privacy Litigation*, 15-cv-03747 (N.D. Cal).  On April 16, 2018, the court certified the class, noting that statutory damages alone could amount to billions of dollars in liability for Facebook.

54.     Between 2010 and 2015, the Individual Defendants ran Facebook as a data-exporting machine.  Facebook gave data – including the profiles of users and friends of users who agreed to take personality quizzes or play games like Mafia Wars, Words with Friends, or FarmVille – to a wide range of developers to assist them in building functions into the Facebook interface.

55.     Until 2015, Facebook's policy and practice was to let app developers tap into sensitive user data as long as users had consented to let those applications use their data.  Most of these "consent" forms required users to reveal far more information than was necessary for the app to function – such as full profile, friend list, and friend profiles – and the terms were all in small print with a large and easy "accept" button as the only thing standing between the user and the desired game.

56.     Facebook shut down this "friends" data sharing practice in 2015, but the data that was pulled previously still remains in the hands of those app developers.

57.     The vulnerabilities for society that are created by Facebook's open data systems were bluntly stated by Facebook Vice President Andrew Bosworth ("Bosworth") in a June 18, 2016 internal memo, as follows:

Andrew Bosworth

June 18, 2016

The Ugly

We talk about the good and the bad of our work often.  I want to talk about the ugly.

We connect people.

That can be good if they make it positive.  Maybe someone finds love.  Maybe it even saves the life of someone on the brink of suicide.

So we connect more people.

That can be bad if they make it negative.  Maybe it costs a life by exposing someone to bullies.  Maybe someone dies in a terrorist attack coordinated on our tools.

And still we connect people.

The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is *de facto* good.  It is perhaps the only area where the metrics do tell the true story as far as we are concerned.

That isn't something we are doing for ourselves.  Or for our stock price (ha!).  It is literally just what we do.  We connect people.  Period.

That's why all the work we do in growth is justified.  All the questionable contact importing practices.  All the subtle language that helps people stay searchable by friends.  All of the work we do to bring more communication in.  The work we will likely have to do in China some day.  All of it.

The natural state of the world is not connected.  It is not unified.  It is fragmented by borders, languages, and increasingly by different products.  The best products don't win.  The ones everyone use win.

I know a lot of people don't want to hear this.  Most of us have the luxury of working in the warm glow of building products consumers love.  But make no mistake, growth tactics are how we got here.  If you joined the company because it is doing great work, that's why we get to do that great work.  We do have great products but we still wouldn't be half our size without pushing the envelope on growth.  Nothing makes Facebook as valuable as having your friends on it, and no product decisions have gotten as many friends on as the ones made in growth.  Not photo tagging.  Not news feed.  Not messenger.  Nothing.

In almost all of our work, we have to answer hard questions about what we believe.  We have to justify the metrics and make sure they aren't losing out on a bigger picture.  But connecting people.  That's our imperative.  Because that's what we do.  We connect people.

58.    Bosworth, one of Zuckerberg's most trusted lieutenants, told the ugly truth about Facebook behind closed doors, but the Individual Defendants steered Facebook away from taking any action to prevent the ills he discussed and continued on the path of expansion above all else.

59.     Zuckerberg himself made a similar admission in an interview with Ezra Klein of Vox on April 2, 2018, stating, "When we started, we thought about how good it would be if people could connect, if everyone had a voice. ***Frankly, we didn't spend enough time investing in, or thinking through, some of the downside uses of the tools***. So for the first 10 years of the company, everyone was just focused on the positive." (Emphasis added).

60.     In the lead up to and aftermath of the 2016 U.S. presidential election, news of Russian meddling was widespread. Facebook and Twitter served as the primary forums for the Russian disinformation campaign. When questioned at the time, Zuckerberg and the other Individual Defendants put forth the Company line that it was "pretty crazy" to think that fake news on Facebook could have had any influence on the outcome of the election. Zuckerberg even sent his general counsel to testify before Congress in his stead because of how much he discounted the issue.

61.     Now that Facebook is under a microscope due to the Breach of Trust, other privacy issues are coming to light. On March 25, 2018, Facebook was forced to admit that it has been keeping texting and call logs for millions of users who use Android phones to access Facebook Messenger. This issue was first uncovered when a user, Dylan McKay, decided to download all of the data Facebook had on him to see what may have been compromised in the Breach of Trust. Mr. McKay then posted on Twitter that his Facebook data file contained a call log of every single call he had made going back several years. The data included who the call was to or from, the date, the time, and the duration. The calls were not made using Facebook, Facebook Messenger, WhatsApp, or any other Facebook app, they were just made natively on his phone. Facebook responded that users had opted-in to this feature on Messenger or Facebook Lite and that it did not sell the data or record the text messages or audio of the calls. It is still unclear how many users were affected by the phone log tracking, but over 1.2 billion users have Facebook Messenger and over 80% of the mobile phone market runs on Android. Thus, nearly one billion users could have unknowingly had their calls and

texts logged by Facebook.  In fact, users recently filed a consumer class action lawsuit in the United States District Court for the Northern District of California on behalf of all affected users titled *Renken and Mannion v. Facebook, Inc.*, 5:18-cv-01896 (N.D. Cal).

62.     The attention brought by the Breach of Trust has also led to the filing of a lawsuit based on violations of the Fair Housing Act due to Facebook enabling users to purchase housing ads that exclude certain protected groups from ever seeing them.  The lawsuit alleges that Facebook provides options that enable landlords to engage unlawful discrimination in advertising without the affected groups even knowing that they are being excluded.

### D.     Cambridge Analytica Exploits Facebook's Lax Data Policies

63.     Cambridge Analytica is a political consulting firm formed in 2013 by Strategic Communication Laboratories Group ("SCL"), conservative operative Bannon, and billionaire Republican donor Mercer.  On June 4, 2014, SCL entered into a commercial arrangement with a company called Global Science Research, owned by Kogan, which was specifically premised on the harvesting and analysis of Facebook data with the goal of matching the data to personality traits and voter rolls.  The company was named Cambridge Analytica by Bannon because Kogan is a faculty member at Cambridge University.

64.     Beginning with campaigns for the 2014 midterm elections, Cambridge Analytica used Facebook data to target voters by pushing ads and content to them supporting conservative candidates.

65.     Next, Cambridge Analytica was hired by Ted Cruz's 2016 presidential campaign (the "Cruz Campaign") in 2015.  On December 11, 2015, *The Guardian* published an article exposing that Cambridge Analytica had helped the Cruz Campaign by using harvested data from millions of unwitting Facebook users.  At that time, a Cruz Campaign spokesman, Rick Tyler stated that they had contracted Cambridge Analytica "because they're a market leader and best in the field" and that Cruz Campaign officials had "done our due diligence."  Mr. Tyler also assured reporters that, "[his]

understanding is that all the information is acquired legally and ethically with the permission of the users when they sign up to Facebook."  Facebook responded to *The Guardian* article by saying the Company was "carefully investigating this situation."

66.    Following this revelation, Facebook learned that Kogan had violated its rules by providing user data to third parties.  Facebook followed up by getting cursory assurances from Kogan and Cambridge Analytica that they had deleted the data.  However, former Cambridge Analytica employee Chris Wylie ("Wylie") claims that these "assurances" were simply a form on which Cambridge Analytica had to swear that it had deleted the data, which Facebook never checked or followed up on in any way.  After Cambridge Analytica allegedly assured Facebook that it had deleted the user data, another employee of Cambridge Analytica told *The New York Times* that hundreds of gigabytes of Facebook user data are still on the company's servers.  Wylie also stated that, "There were multiple copies of it.  It had been emailed in unencrypted files."

67.    Even before the story related to the Cruz Campaign, Wylie says that "Facebook could see it was happening.  Their security protocols were triggered because Kogan's apps were pulling this enormous amount of data, but apparently Kogan told them it was for academic use.  So they were like, 'Fine.'"

68.    During Zuckerberg's testimony before a joint hearing of the Senate Judiciary Committee and Senate Committee on Commerce, Science, and Transportation on April 10, 2018, he was questioned by Senator Kamala Harris regarding Facebook's handling of the Cruz Campaign Cambridge Analytica revelation and answered, in pertinent part, as follows:

> [HARRIS]:  And then another case in point specifically as it relates to Cambridge Analytica, is – and a concern of mine – is that *you, meaning Facebook and I'm going to assume you personally as CEO, became aware in December of 2015 that Dr. Kogan and Cambridge Analytica misappropriated data from 87 million Facebook users.  That's 27 months ago that you became as Facebook, and perhaps you personally, became aware.  However, a decision was made not to notify the users.*  So my question is, did anyone at Facebook have a conversation at the time that you

became aware of this breach?  And have a conversation wherein the decision was made not to contact the users?

ZUCKERBERG:  Senator, I don't know if there were any conversations at Facebook overall because I wasn't in a lot of them.  But –

HARRIS:  On that subject.

ZUCKERBERG:  Yeah.  I mean, I am not sure what other people discussed.  At the time in 2015 we heard the report that this developer Alexander Kogan had sold data to Cambridge Analytica.  That's in violation of our terms.

HARRIS:  Correct.  And were you a part of the decision – were you part of a discussion that resulted in a decision not to inform your users?

ZUCKERBERG:  I don't remember a conversation like that.  But the reason why –

HARRIS:   Are you aware of anyone in leadership at Facebook who was in a conversation where a decision was made not to inform your users?  Or do you believe no such conversation ever took place?

ZUCKERBERG:  I'm not sure whether there was a conversation about that but I can tell you the thought process at the time of the company, which was that in 2015 when we heard about this, we banned the developer and we demanded that they delete all of the data and stop using it, and the same with Cambridge Analytica.

HARRIS:   And I appreciate your testimony in that regard, but I'm talking about notification of the users.   And this relates to the issue of transparency and the relationship of trust.  Informing the user about what you know in terms of how their personal information has been misused.  *And I'm also concerned that when you personally became aware of this, did you or senior leadership do an inquiry to find out who at Facebook had this information and did they not have a discussion about whether or not the users should be informed back in December of 2015?*

ZUCKERBERG:  *Senator in retrospect, I think we clearly view it as a mistake that we did not inform people.*  And we did that based on false information that we thought that the case was closed and the data had been deleted.

HARRIS:  *So there was a decision made on that basis not to inform the users, is that correct?*

ZUCKERBERG:  *That's my understanding, yes.  But in retrospect, I think that was a mistake, and knowing what we know now, we should have handled a lot of things here differently.*

HARRIS:  And I appreciate that point.  Do you know when that conversation, when that decision was made not to inform the users?

ZUCKERBERG: I don't.

(Emphasis added).

69.     Because the Individual Defendants failed to act once Cambridge Analytica's scheme was revealed in December 2015, Cambridge Analytica was able to continue using users' Facebook data through the 2016 election and would have been able to quietly continue its scheme through the 2018 midterms had the Breach of Trust not come to light.  The Cambridge Analytica scheme was carried out as follows:

        a)      Kogan, a Russian-American academic at Cambridge University, got permission from Facebook to pull data via an app he created, but he reportedly claimed he would use this data only for academic purposes, not commercial ones.  He immediately violated this by using it for electioneering.

        b)      Kogan's app, "thisisyourdigitallife," was a personality quiz Facebook users could take.  However, to take the quiz, users had to consent to give the app access to their and their friends' Facebook profiles.  This information was not necessary for the quiz to function, it was requested solely for data mining purposes.  Facebook had no monitoring system for this type of obvious misconduct at the time and the Individual Defendants have continued to fail to implement one.

        c)      More than 270,000 people used the app and took the quiz.  However, because they consented to give the app access to their friends' profiles, Kogan was able to collect data from up to 87 million profiles, which about 30 million could be matched with other records that helped identify people.

        d)      Cambridge Analytica was the brains behind Kogan's operation and ended up spending about $7 million on this data.

70.     Wylie came forward in early 2018 to reveal the full scope of Cambridge Analytica's scheme.  He was the primary source for the articles in *The New York Times* and *The Guardian* that

brought the Breach of Trust to light.  He has since stated that the Breach of Trust affected "substantially" more than 50 million Facebook users.  Wylie told a U.K. parliamentary select committee that 50 million is the number that can be verified and safely reported by news sources, but in truth it is much higher.  On April 4, 2018, Facebook's Chief Technology Officer, Mike Schroepfer, admitted that the true number was approximately 87 million.  Wylie also elaborated on the misappropriation process, as follows:

> For example, if you are able to create profiling algorithms that can predict certain traits — so let's say a high degree of openness and a high degree of neuroticism — and when you look at that profiles that's the profile of a person who's more prone towards *conspiratorial thinking*, for example, *they're open enough to kind of connect to things that may not really seem reasonable to your average person*.  And they're anxious enough and impulse enough to start clicking and reading and looking at things — and *so if you can create a psychological profile of a type of person who is more prone to adopting certain forms of ideas, conspiracies for example, you can identify what that person looks like in data terms*.  *You can then go out and predict how likely somebody is going to be to adopt more conspiratorial messaging.  And then advertise or target them with blogs or websites or various — what everyone now calls fake news — so that they start seeing all of these ideas, or all of these stories around them in their digital environment.  They don't see it when they watch CNN or NBC or BBC.  And they start to go well why is that everyone's talking about this online?*  Why is it that I'm seeing everything here but the mainstream media isn't talking about [it] . . .  Not everyone's going to adopt that — so that advantage of using profiling is you can find the specific group of people who are more prone to adopting that idea as your early adopters. . . .  So if you can find those people in your datasets because you know what they look like in terms of data you can catalyze a trend over time.  *But you first need to find what those people look like.*
>
> That was the basis of a lot of our research [at CA and sister company SCL]. . . .  How far can we go with certain types of people.  And who is it that we would need to target with what types of messaging.

(Emphasis added).

71.   Kogan and Cambridge Analytica also had substantial ties to the Russian government and Russian oligarchs.  In addition to being a faculty member at Cambridge University, Kogan is also an associate professor at St. Petersburg University.  He has also received generous grants from the Russian government to research "Stress, health and psychological wellbeing in social networks."  Cambridge Analytica also made a pitch to Lukoil, a Russian oil company controlled by Russian

oligarch and associate of Vladimir Putin, Vagit Alekperov.  The goal of the pitch concerned the targeting of information on American voters.  Wylie remarked that it was strange that a Russian oil company wanted to influence an American election.  Cambridge Analytica also reached out to Julian Assange after Wikileaks began posting hacked email from the Democratic National Committee and Hillary Clinton's presidential campaign in an effort to coordinate their release.  Long before these facts came to light, Cambridge Analytica had been in the cross hairs of Special Counsel Robert Mueller's investigation into potential collusion between the Trump Campaign and Russia.  Cambridge Analytica with its vast ties to both the Trump Campaign and Russia is one of many such links and Facebook was used as the primary weapon for its warfare.

72.    Cambridge Analytica, the Trump Campaign, and their Russian allies were able to use these psychological profiles to push completely untrue, but based in embedded bias, news stories to particularly vulnerable Facebook users.  Facebook's algorithm prioritizes posts with "engagement." These types of stories often rose to the tops of users' News Feeds because they were so heavily liked, hated, and commented upon.

73.    This user targeting was highly effective in the 2016 election.  Mr. Trump lost the popular vote by over 3 million votes across the entire United States, but 30,000 votes spread out over several key states led to his electoral college victory.  Many of these voters were likely those individuals targeted by Cambridge Analytica's work.  In essence, Facebook's lax security with its users' data helped swing a presidential election.  The consequences could not have been graver.

74.    In the lead up to the election, Facebook was criticized for being run by young progressives and perhaps being biased against conservatives and conservative speech.  This may have caused Zuckerberg and the other Individual Defendants to be overly lax with regard to the spreading of fake news on the site because they did not want to appear biased.  One engineer told *Vox* that this led to "fake news [running] wild on our platform for the entire campaign season."

75.     In fact, Craig Silverman of *BuzzFeed News* performed an analysis that showed that the 20 highest-performing fake news stories of the closing days of the 2016 presidential election were viewed and shared on Facebook more than the 20 highest-performing real ones.  This engagement level in fake news stories spiked as the election neared, especially in the August to November period.

76.     Facebook also allowed these fake news outlets to purchase ads on its platform during the 2016 election and only cut them off following public outrage at the election result.  These ads served to provide credibility to the bogus content being pushed to targeted users by Cambridge Analytica, the Trump Campaign, and their Russian allies.

### E.      Facebook's Complicity in the Breach of Trust

*If you let the bank robbers into the vault, they still stole the fucking money.*

- Jon Lovett, former presidential speechwriter, on Zuckerberg's claims that Facebook has no culpability in the Breach of Trust

77.     In all of the Company's public comments following the Breach of Trust, the Individual Defendants have caused Facebook to claim it was the victim of Cambridge Analytica's misuse of user data, rather than a knowing co-conspirator.  This is a false narrative.

78.     Following the 2011 FTC Consent Order, the Individual Defendants knew that Facebook had a codified duty to protect users' data.  Any failure in upholding that duty would result directly in large fines and a breach of the Consent Order.  Yet, Facebook took only minimal action once Cambridge Analytica's actions came to their attention in 2015, and to date has taken little action to tighten its controls over user data.  Defendants Zuckerberg, Sandberg, and Cox had particular responsibilities to be vigilant as they were executive officers responsible for the management of Facebook's products and their use of user data.

79.     In addition to these overt acts, one particular Individual Defendant, Thiel, has close personal connections to Cambridge Analytica.  Thiel founded Palantir in 2004.  To this day, Thiel remains Palantir's chairman.  Cambridge Analytica received help with its Facebook data harvesting

operation from Palantir.  Whistleblower Wylie told British lawmakers that, "There were senior Palantir employees that were also working on the Facebook data" when he described how Cambridge Analytica carried out its scheme.

80.    Thiel is also closely aligned with Bannon and Mercer.  Bannon described Thiel as a hidden hand in shaping team Trump, stating "I cannot overstate his impact on the transition" and "You will see in the near term that Peter [Thiel] will be taking on new responsibilities, like intelligence."  Bannon has also talked about being in the trenches alongside Thiel as part of an offensive against the so-called "deep state" – a term used in certain conspiratorial quarters, recently on the far right, to describe what they see as a force within the government, including the intelligence agencies, that consistently asserts its power in order to maintain the status quo.

81.    One long-time friend and colleague of Thiel described him as someone who "exempts himself from the rules he applies to others.  He's a hard-core libertarian who rails against state surveillance except when he's profiting off of it.  He's a strong believer in personal privacy but is happy to kick-start and sit on the board of Facebook, which monetizes every ounce of Americans' data."  Bannon even remarked that comparatively he saw himself as the moderating influence on Thiel's extreme views.

82.    Thiel was one of the early investors in Facebook, first investing in 2005.  His close ties to Cambridge Analytica and the Trump Campaign likely led to the other Individual Defendants' inaction.

83.    The Individual Defendants were aware that Facebook's users' privacy had been compromised by at least December 2015 but did not act to kick Cambridge Analytica off the site until mid-March 2018 when they learned that *The New York Times* and *The Guardian* were on the verge of publishing articles exposing the Breach of Trust.

84.     Once the Breach of Trust became public, a long-time Facebook ally, Roger McNamee, came public with news that he had warned Zuckerberg and Sandberg privately in 2016 about how "bad actors" could exploit Facebook in the 2016 U.S. presidential election and how it had been done in the U.K. during the Brexit campaign.  Mr. McNamee had provided Zuckerberg and Sandberg with specific steps Facebook could take to safeguard its users and support democracy itself, but he was merely told that it was not an issue and not Facebook's problem as it was "merely a platform" and "not responsible for third-party content on its site."

85.     Mr. McNamee had previously mentored Zuckerberg from 2006 to 2009, and stated that during that time, Zuckerberg "was more curious, he was more open, he was more willing to take pushback."  Mr. McNamee further explained that as Facebook expanded to unimagined heights, the "scarcity of technology and resources" suddenly turned into a surplus "[a]nd the libertarian value system went into overdrive."

## F.     The Individual Defendants' Response to the Breach of Trust

86.     For several days following the articles in *The New York Times* and *The Guardian* revealing the Breach of Trust, Zuckerberg, Sandberg, and the other Individual Defendants remained silent about the incident.  It was not until March 21, 2018, when Zuckerberg began his apology tour with an interview on CNN, that they spoke publicly.

87.     The first comment of any kind from Facebook came in the form of a Facebook post by Vice President and Deputy General Counsel, Paul Grewal ("Grewal"), who posted on March 16, 2018 and subsequently edited on March 17, 2018.  Grewal stated, in relevant part:

> Protecting people's information is at the heart of everything we do, and we require the same from people who operate apps on Facebook.  In 2015, we learned that a psychology professor at the University of Cambridge named Dr. Aleksandr Kogan lied to us and violated our Platform Policies by passing data from an app that was using Facebook Login to SCL/Cambridge Analytica, a firm that does political, government and military work around the globe.  He also passed that data to Christopher Wylie of Eunoia Technologies, Inc.

Like all app developers, Kogan requested and gained access to information from people after they chose to download his app. His app, "thisisyourdigitallife," offered a personality prediction, and billed itself on Facebook as "a research app used by psychologists." Approximately 270,000 people downloaded the app. In so doing, they gave their consent for Kogan to access information such as the city they set on their profile, or content they had liked, as well as more limited information about friends who had their privacy settings set to allow it.

Although Kogan gained access to this information in a legitimate way and through the proper channels that governed all developers on Facebook at that time, he did not subsequently abide by our rules. By passing information on to a third party, including SCL/Cambridge Analytica and Christopher Wylie of Eunoia Technologies, he violated our platform policies. When we learned of this violation in 2015, we removed his app from Facebook and demanded certifications from Kogan and all parties he had given data to that the information had been destroyed. Cambridge Analytica, Kogan and Wylie all certified to us that they destroyed the data.

88. In his CNN interview, Zuckerberg also confirmed that Facebook was aware of Cambridge Analytica's actions in 2015.

89. Wylie and another former Cambridge Analytica employee have revealed that Facebook's cursory demand for deletion of the data was unsuccessful.

90. Following the revelation of the Breach of Trust, *The New York Times* reported that Alex Stamos ("Stamos"), Facebook's chief of security, had grown dissatisfied with the actions of the Individual Defendants and was planning to exit the Company in a few months. Stamos had been butting heads with his colleagues over this issue for some time and the public revelation of the Breach of Trust was the straw that broke the camel's back.

91. Finally, despite this negative information coming to light and the Individual Defendants having years to rectify it, Zuckerberg recently told CNN that he is "sure that there's V2, version two of whatever the Russian effort was in 2016" ongoing using Facebook for evil means in the upcoming 2018 midterm elections. Data protection was a problem in Facebook's past and the Individual Defendants failed to stop it. It is an issue in Facebook's present and the Individual Defendants are failing to stop it. And, as Zuckerberg himself admits, it will be a problem in Facebook's future that it is ill-equipped to stop.

32

G.     **The False and Misleading Proxy Statements**

92.     In addition to the lack of internal controls and failure to act which allowed the Breach of Trust, the Individual Defendants likewise caused the Company to issue false and misleading proxy statements, which sought stockholder votes for, *inter alia*, director reelection and executive compensation policies.

93.     On June 2, 2016, the Individual Defendants caused Facebook to file with the SEC and disseminate to stockholders a Proxy Statement on Form DEF 14A (the "2016 Proxy") in connection with the Company's annual stockholder meeting.  The Individual Defendants drafted, approved, reviewed, and/or signed the 2016 Proxy before it was filed with the SEC and disseminated to Facebook's stockholders.  The Individual Defendants knew, or were deliberately reckless in not knowing, that the 2016 Proxy was materially false and misleading.

94.     Among other things, the 2016 Proxy sought stockholder approval for the re-election of all eight of the Director Defendants, each to serve another one-year term.

95.     With respect to the compensation of the Company's executives, the 2016 Proxy set forth to Facebook stockholders that at least a portion the Company's executive compensation was performance based.  As noted in the 2016 Proxy, this incentive-based compensation came in several forms in 2015, including performance-based cash incentives and equity-based RSU awards.

96.     On April 14, 2017, the Individual Defendants caused Facebook to file with the SEC and disseminate to stockholders a Proxy Statement on Form DEF 14A (the "2017 Proxy") in connection with the Company's annual stockholder meeting.  The Individual Defendants drafted, approved, reviewed, and/or signed the 2017 Proxy before it was filed with the SEC and disseminated to Facebook's stockholders.  The Individual Defendants knew, or were deliberately reckless in not knowing, that the 2017 Proxy was materially false and misleading.

97.     Among other things, the 2017 Proxy sought stockholder approval for the re-election of all eight of the Director Defendants, each to serve another one-year term.

98.     With respect to the compensation of the Company's executives, the 2017 Proxy set forth to Facebook stockholders that at least a portion the Company's executive compensation was performance based.  As noted in the 2017 Proxy, this incentive-based compensation came in several forms in 2016, including cash bonuses, bonus plan payouts, equity compensation, and the vesting of RSU awards.

99.     The 2017 Proxy also included a stockholder proposal requesting Facebook to issue a report (at reasonable cost, omitting proprietary or legally privileged information) reviewing the public policy issues associated with fake news enabled by Facebook.  The proposal was voted down, in large part because the true facts regarding the Breach of Trust remained concealed.

100.    The Exchange Act requires publicly-traded companies to disclose all "material information" to stockholders.  The SEC has issued guidance on the public reporting of cybersecurity incidents and widely encourages companies to "use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters."

101.    In the 2016 Proxy and 2017 Proxy, the Individual Defendants caused or allowed Facebook to completely fail to mention the Breach of Trust in any way.  Additionally, the Individual Defendants kept Facebook from disclosing it in any Form 8-K or Form 6-K filing prior to the news being revealed by the articles in *The New York Times* and *The Guardian* on March 17, 2018.  By the time the 2016 Proxy and 2017 Proxy were issued, the Individual Defendants already knew of the significant damage to the Company that would grow exponentially once the facts of the Breach of Trust became public.

102.    Accordingly, the 2016 Proxy and 2017 Proxy, as set forth above, were false and misleading when issued.

H.      **Defendants Zuckerberg, Sandberg, and Koum Unlawfully Profited at Facebook's Expense by Selling Shares at Artificially-Inflated Prices**

103.   While in possession of knowledge that Facebook had not solved the problems underlying the Breach of Trust, Zuckerberg, Sandberg, and Koum sold large quantities of their personal holdings of Facebook shares at inflated prices totaling over $1.45 billion in the days prior to the Breach of Trust coming to light.

104.   Zuckerberg is Facebook's founder, CEO, chairman, and controlling stockholder. Zuckerberg was aware of material, adverse, and non-public information regarding Facebook's data protection deficiencies and the Company's statements related thereto.  While in possession of this information, Zuckerberg sold 5,423,200 shares of Facebook stock between February 12, 2018 and March 15, 2018, at artificially-inflated prices, for total proceeds of over $978 million.

105.   Sandberg is Facebook's COO and a member of the Board.  Sandberg was aware of material, adverse, and non-public information regarding Facebook's data protection deficiencies and the Company's statements related thereto.  While in possession of this information, Sandberg sold 196,684 shares of Facebook stock between February 14, 2018 and March 15, 2018, at artificially-inflated prices, for total proceeds of over $35 million.

106.   Koum is a member of Facebook's Board.  Koum was aware of material, adverse, and non-public information regarding Facebook's data protection deficiencies and the Company's statements related thereto.  While in possession of this information, Koum sold 2,485,347 shares of Facebook stock between February 15, 2018 and February 20, 2018, at artificially-inflated prices, for total proceeds of over $442 million.

107.   These insider sales total over $1.45 billion in proceeds and were all executed while Facebook's stock price was artificially inflated due to the unlawful conduct alleged herein.

## DAMAGES TO FACEBOOK

108.  Because of the Individual Defendants' wrongful conduct, Facebook allowed Cambridge Analytica and its shady customers – including its Russian allies, Ted Cruz and Donald Trump's presidential campaigns, the U.K.'s "leave" campaign in the Brexit vote, and countless others which are sure to be revealed – to prey on Facebook's users based on their data which was mined via a personality quiz app.  This widespread breach of trust has devastated Facebook's credibility. Facebook has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

109.  Indeed, the Individual Defendants' actions and the false and misleading statements related thereto, as alleged above, have subjected Facebook to three complaints for violations of the federal securities laws in the United States District Court for the Northern District of California, captioned *Yuan v. Facebook, Inc., et al.*, Case No. 5:18-cv-01725, *Casey v. Facebook, Inc., et al.*, 5:18-cv-01780 (N.D. Cal.), and *Bennett v. Facebook, Inc., et al.*, Case No. 3:18-cv-01868 (N.D. Cal.) (the "Securities Class Actions").  The allegations in the Securities Class Actions are incorporated by reference as if fully set forth herein.

110.  The Individual Defendants' misconduct described herein has also led to the filing of several consumer class actions alleging violations of users' privacy rights.  These actions seek billions of dollars in damages.  *See, e.g., Price v. Facebook, Inc., et. al.*, 3:18-cv-01732 (N.D. Cal.).

111.  The FTC has also launched a new investigation into the claims described herein.  If Facebook is found to have violated the 2011 Consent Order, each violation could warrant a $40,000 fine, totaling trillions of dollars in liability for the Company.

112.  Several U.S. Senators and states' attorneys general have called for and begun investigations into the Company's conduct.  On March 23, 2018, Illinois became the first state to file a lawsuit against Facebook and Cambridge Analytica, alleging a "fraudulent scheme to harvest the

data of millions of American voters." Illinois' lawsuit further alleges that "[t]his kind of mass data collection was not only allowed but encouraged by Facebook, which sought to keep developers building on its platform and provide companies with all the tools they need to influence and manipulate user behavior" and that "Facebook is not a social media company; it is the largest data mining operation in existence."

113. Lawmakers from all sides, both geographically and politically, have called for enhanced regulation of Facebook, and Sandberg and Zuckerberg apparently agree. Sandberg told CNBC: "It's not a question of if regulation, it's a question of what type. We're open to regulation. We work with lawmakers all over the world." These new regulations may include a "privacy bill of rights."

114. The European Union already approved something similar, entitled the "General Data Protection Regulation," which goes into effect on May 25, 2018. It is designed to ensure that users are able to consent to the data that is collected about them and that companies are clear about how user data is used. The EU regulation also requires companies to afford users the ability to access the data that companies have on them, allow users to correct any information that is inaccurate, and limit how algorithms will be allowed to process their data. Another incident like the Breach of Trust will cost Facebook billions under the EU regulation. Facebook spent more on lobbying in the U.S. in 2017 than in any previous year – an expense that will only increase after the backlash from the Breach of Trust – and will likely not be able to prevent a similar data protection regulation from being enacted in the U.S. In addition to lobbying costs, complying with these new regulations will cost Facebook millions of dollars each year.

115. Zuckerberg testified before both houses of Congress on April 10 and 11, 2018. His prepared remarks included substantial admissions of wrongdoing and personal culpability for the harm to Facebook and its users described herein. The questioning led to additional admissions of

wrongdoing.  Further, Zuckerberg answered numerous questions by stating that the Company would need to investigate to find a proper answer.  These investigations will cost the Company untold sums of money.

116.    Zuckerberg also has been called to testify before the Federal Election Commission, along with Twitter CEO Jack Dorsey and Alphabet (Google's parent) CEO Larry Page, on June 27, 2018.  He has not yet accepted that invitation.  The three executives have been called before Congress multiple times to discuss Russian meddling in the 2016 election, but so far have yet to appear, sending general counsels in their stead.  Now that Zuckerberg has testified before Congress regarding the Breach of Trust, it is more likely he will also testify in-person before the Federal Election Commission.

117.    Facebook users the world over have banded together using the hashtag #deletefacebook in a movement for users to delete their accounts in response to the Breach of Trust.  This movement has even spread to some corporate accounts as Elon Musk, for example, very publicly deleted the accounts for Tesla, Inc. and SpaceX.  Facebook users were already starting to decline for the first time ever last quarter.  Facebook lost 2.8 million users under the age of 25 in 2017 and was set to lose another 2 million in 2018 (before the Breach of Trust) according to eMarketer.  The #deletefacebook movement, government investigations, and class action lawsuits are sure to raise the number of users lost for the year.

118.    Polls following the revelation of the Breach of Trust also show that a majority of Facebook users now plan to spend less time on Facebook.  This will lead to reduced user engagement and ad sales, the lifeblood of Facebook.

119.    Facebook also planned to unveil its home speaker assistant in May 2018 and begin sales in the fall of 2018.  Due to the Breach of Trust and the immense negative privacy-related press the Company has received, that release has been postponed indefinitely.  Even before the Breach of Trust,

focus groups were wary of a "Facebook-branded device in their living rooms." Now it is very likely that this new line of products, which the Individual Defendants caused Facebook to spent countless millions of dollars developing, will never see the light of day.

120.   The Individual Defendants have chosen to expend Facebook's resources in the wake of the Breach of Trust on a public apology tour rather than acting to fix the deep-rooted problems at the Company's core related to the treatment of users and their sensitive data. The Individual Defendants have caused Facebook to waste countless sums on public relations, including full-page ads in major newspapers.

121.   As a direct and proximate result of the Individual Defendants' actions as alleged herein, Facebook's market capitalization has been substantially damaged, losing nearly $100 billion of dollars in value as a result of the Breach of Trust.

122.   Moreover, these actions have irreparably damaged Facebook's corporate image and goodwill. For at least the foreseeable future, Facebook will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Facebook's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

123.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.   Plaintiff brings this action derivatively in the right and for the benefit of the company to redress the Individual Defendants' breaches of fiduciary duties, violations of the federal securities laws, misappropriation of information, and unjust enrichment.

125.   Plaintiff is an owner of Facebook common stock and was an owner of Facebook common stock at all times relevant hereto.

126.   Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

127.   As a result of the facts set forth herein, Plaintiff has not made any demand on the Facebook Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

128.   At the time this action was commenced, the Board consisted of nine directors: defendants Zuckerberg, Sandberg, Thiel, Andreessen, Hastings, Bowles, Koum, and Hellmann and non-defendant Kenneth I. Chenault ("Chenault").[2]  All Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. Because these defendants represent a majority of the Board, any demand on the Board would be futile.

A.     **Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability**

129.   The Director Defendants face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the data misappropriation and exploitation, and as such had a fiduciary duty to ensure that the Company protected its user base and that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

130.   Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls

_____

[2]  Chenault began serving on the Board in February 2018. As such, he was not yet a member of the Board for the majority of the wrongdoing. Nevertheless, since Zuckerberg is Facebook's controlling stockholder, Chenault is as beholden to Zuckerberg as the other directors and demand upon him would be futile.

were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of the materially false and misleading 2016 Proxy and 2017 Proxy discussed above.

131.   The Director Defendants' making or authorization of the false and misleading 2016 Proxy and 2017 Proxy, failure to timely correct the statements therein, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Facebook to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile.

**B.     Defendant Zuckerberg Lacks Independence**

132.   As an initial matter, Zuckerberg controls 59.7% of Facebook's voting power and is its controlling stockholder.  He alone has the power to elect or remove any member of the Board or to approve or strike down any stockholder proposal.  He is also the Company's founder and has served as its only CEO.  Further, he faces additional substantial likelihood of liability as he illegally sold shares totaling $978 million in the days leading up to the revelation of the Breach of Trust and is a named defendant in the Securities Class Actions.  As such, Zuckerberg is incapable of considering a demand to commence and vigorously prosecute this action.

**C.     Defendant Sandberg Lacks Independence**

133.   Sandberg's primary occupation is serving as COO of Facebook.  According to the Company's SEC filings, in 2014, 2015, and 2016, Sandberg received total compensation of

$15,549,402, $18,698,969, and $24,549,457, respectively.  As both an officer and director of the Company, she cannot be considered an independent Board member.  Sandberg also illegally sold shares totaling $35 million in the days leading up to the revelation of the Breach of Trust and is a named defendant in the Securities Class Actions.  Therefore, she is incapable of considering a demand to commence and vigorously prosecute this action.

      **D.**      **Defendants Sandberg, Thiel, Andreessen, Hastings, Bowles, Koum, and Hellmann are Controlled by Zuckerberg and Therefore Lack Independence**

134.  As Zuckerberg controls 59.7% of Facebook's voting power and has controlled either that percentage or more since the Company's founding, he personally placed each of the other Director Defendants on the Board and could personally remove any of them if he so chose.  Facebook admits in its SEC filings that it is a "controlled company" with Zuckerberg having controlling power.  In essence, the other Director Defendants are simply Zuckerberg's "yes men" who will rubber-stamp any proposal he puts forward and are incapable of holding him accountable.  Therefore, demand upon them is futile.

      **E.**      **Demand is Excused Because a Majority of the Current Board Members Are Not Disinterested as They Face a Substantial Likelihood of Liability**

135.  The Director Defendants are not disinterested because they each face a substantial likelihood of liability in light of their service on the Board and failure to act in light of the events described herein.

136.  Each of the Director Defendants was either a member of the Board when the Consent Order was signed or was aware of its terms.  Each had a heightened duty to uphold its terms.  As each Director Defendant breached that duty, he or she faces a substantial likelihood of liability.

137.  Defendant Thiel and his affiliate entities were active participants in the breach underlying the Breach of Trust.  He therefore faces a high likelihood of liability for his actions.

138.   In addition, each of the other Director Defendants opted not to protect Facebook or its users out of loyalty to Thiel and, thus, faces a substantial likelihood of liability.

**F.     Demand is Futile as to Defendants Zuckerberg, Sandberg, and Koum Because They Have Engaged in Illegal Insider Trading**

139.   Zuckerberg, Sandberg, and Koum are alleged to have engaged in illegal insider trading. Accordingly, when the Board considers these allegations of insider trading, Zuckerberg, Sandberg, and Koum cannot disinterestedly vote on whether to initiate a lawsuit concerning such allegations. Thus, demand is futile as to them.

140.   Because Zuckerberg, Sandberg, and Koum are inherently interested in their insider trading transactions, they have breached their duty of loyalty to the Company and therefore face a substantial likelihood of personal liability, further exhibiting why demand upon them is excused.

**G.     Demand is Futile as to the Director Defendants for the Following Additional Reasons**

141.   If Facebook's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.   However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Facebook against the Individual Defendants, known as the "insured versus insured exclusion."

142.   As a result, if the Director Defendants were to sue themselves or certain of the officers of Facebook, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.   On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.   Therefore, the Director Defendants cannot be expected to file the claims asserted in this

derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

143.   Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Facebook by prosecuting this action. Therefore, demand on Facebook's Board is futile and is excused.  Facebook has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

144.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

145.   The Individual Defendants each owed Facebook and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs.

146.   The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Facebook.

147.   The Individual Defendants breached their fiduciary duties owed to Facebook and its stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee Facebook's business, rendering them personally liable to the Company.

148.   Each of the Individual Defendants had actual or constructive knowledge that the Breach of Trust was occurring and that Facebook's data privacy controls were too lax, potentially in violation of the 2011 FTC Consent Order.  Regardless, the Individual Defendants continued to allow the Breach of Trust to occur and the weak policies to remain in place harming the Company and its user base.

149.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, candor, and due care, as alleged herein, Facebook has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### AGAINST DEFENDANTS ZUCKERBERG, SANDBERG, AND KOUM FOR BREACH OF FIDUCIARY DUTY IN CONNECTION WITH MISAPPROPRIATION OF INFORMATION AND INSIDER STOCK SALES

150.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

151.   At the time of each of the stock sales set forth herein, defendants Zuckerberg, Sandberg, and Koum knew, but did not disclose publicly, that the Company was allowing user information to be mined for nefarious purposes.  Defendants Zuckerberg, Sandberg, and Koum further knew, but did not disclose publicly, that that these facts would substantially harm the Company.  Defendants Zuckerberg, Sandberg, and Koum made each of the stock sales described herein on the basis of and because of their knowledge of the material non-public information described herein.

152.   At the time of their stock sales, defendants Zuckerberg, Sandberg, and Koum knew that when the Company's conduct came to light, the price of the Company's common stock would dramatically decrease.  Defendants Zuckerberg, Sandberg, and Koum's sales of Facebook common stock based on their knowledge of this material non-public information was a breach of their fiduciary duties of loyalty and good faith.

## COUNT III

### AGAINST DEFENDANTS ZUCKERBERG, SANDBERG, AND KOUM FOR UNJUST ENRICHMENT

153.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

154.   Defendants Zuckerberg, Sandberg, and Koum were unjustly enriched by their receipt of proceeds from their illegal sales of Facebook common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

155.   To remedy defendants Zuckerberg, Sandberg, and Koum's unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of Facebook common stock.

## COUNT IV

### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) AND SEC RULE 14A-9 PROMULGATED THEREUNDER

156.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

157.   SEC Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

158.   The 2016 Proxy and 2017 Proxy violated Section 14(a) and Rule 14a-9 because they solicited Facebook stockholder votes for director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's lax privacy policies and the continued allowance of misappropriation of user data.  Further, the 2017 Proxy contained a stockholder proposal regarding a

report on fake news.  This provision was voted down due to the false and misleading statements in the 2017 Proxy.

159.   The Individual Defendants' statements in the 2016 Proxy and 2017 Proxy, which clearly represented that the Company followed an incentive-based compensation structure, were false and misleading because the 2016 Proxy and 2017 Proxy failed to disclose that the Company's financial performance was illusory and misstated.  By the time the 2016 Proxy and 2017 Proxy were issued, the Individual Defendants already knew of the significant problems associated with the Breach of Trust, and therefore, that the Company's purported financial results (issued under the Individual Defendants' direction and on their watch) that the executive compensation was based upon, were materially misstated.

160.   The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company and/or roles in the process and in the preparation of the 2016 Proxy and 2017 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2016 Proxy and 2017 Proxy.

161.   In the exercise of reasonable care, the Individual Defendants should have known that the statements contained in the 2016 Proxy and 2017 Proxy were materially false and misleading.

162.   The omissions and false and misleading statements in the 2016 Proxy and 2017 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the reelection of directors.  In addition, a reasonable investor would view full and accurate disclosure as significantly altering the "total mix" of information made available in the 2016 Proxy and 2017 Proxy and in other information reasonably available to stockholders.

163.   As a direct and proximate result of the dissemination of the false and/or misleading 2016 Proxy and 2017 Proxy, which the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors and pay excessive compensation to executive officers, among other things, nominal defendant Facebook suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors and paying compensation based on inflated financials to executives) in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of Facebook and that Plaintiff is a proper and adequate representative of the Company;

B.   Determining that the Individual Defendants have breached their fiduciary duties to Facebook;

C.   Declaring that the Individual Defendants are obligated to contribute to, indemnify, and hold Facebook harmless from any fines, penalties, judgment, settlement, or award pursuant to any of the class actions pending or to be filed against Facebook or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

D.   Awarding Facebook the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

E.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

F.   Ordering defendants Zuckerberg, Sandberg, and Koum to disgorge to the Company all proceeds derived from their sales of Facebook common stock alleged herein;

G.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

H.      Ordering the Individual Defendants to reimburse Facebook for all fines relating to violations of the Consent Order and any other breaches of laws or agreements related to the Breach of Trust;

I.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

J.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  April 18, 2018

OF COUNSEL:

**HYNES KELLER & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
(484) 875-3116

**BRAGAR EAGEL & SQUIRE, P.C.**
Todd H. Henderson
Melissa A. Fortunato
885 Third Avenue, Suite 3040
New York, New York 10022
(212) 308-5858

**ROSENTHAL, MONHAIT & GODDESS, P.A.**

*/s/ P. Bradford deLeeuw*
Jessica Zeldin (#3558)
P. Bradford deLeeuw (#3569)
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
(302) 656-4433

*Attorneys for Plaintiff*